### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

RANDALL LEE MAYS,                    )
                                     )
      **Plaintiff,**                  )
                                     )
**v.**                               )     **Civil Action No. 3:22-00319**
                                     )
**ADMIN. ALDRIDGE,** *et al.***,**   )
                                     )
      **Defendants.**                 )

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Defendant Bryant's "Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment" (Document No. 60), filed on January 31, 2023. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendant Bryant's Motion and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by Defendant Bryant in moving to dismiss. (Document No. 62.) Plaintiff failed to file a Response. Having examined the record and considered the applicable law, the undersigned has concluded that Defendant Bryant's Motion (Document No. 60) should be granted.

### PROCEDURAL BACKGROUND

On August 4, 2022, Plaintiff, acting *pro se*,[1] filed his Application to Proceed Without Prepayment of Fees or Costs (Document No. 1) and Complaint for alleged violations of his constitutional rights pursuant to 42 U.S.C. § 1983 (Document No. 2). In his Complaint, Plaintiff names the following as Defendants: (1) Western Regional Jail; (2) Admin. Aldridge; and (3) Major

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Fleming. (Document No. 2.) Plaintiff alleges that he was severely beaten by inmate gang members during his confinement at the Western Regional Jail ("WRJ") on August 15, 2020. (Id.) Plaintiff states as follows: "I was beaten. I was stripped down and all my clothes were taken off. They held me down and beat me. They took turns holding my head up so they could put their d*cks on my face, and force me to hold their d*cks in my hand while others stood over me and rubbed their d*cks on my body and over my a**." (Id.) Plaintiff explains that the beating began around 5:30 p.m. and lasted for hours. (Id.) Plaintiff alleges he passed out from "blood loss." (Id.) Plaintiff states that around 10:50 p.m., an officer came into the pod and announced lockdown. (Id.) Plaintiff claims that he approached the officer and requested help, but the officer "grabbed [Plaintiff] by the shirt and put [him] back into the cell." (Id.) Plaintiff states that the left side of his nose was severely cut and was hanging off his face. (Id.) Plaintiff asserts that he "fell on the floor, and the roommates pushed the button to get [him] help because the people that attacked [Plaintiff] were no longer in the room." (Id.) Plaintiff alleges that the Tower Officer, Z. Priest, answered the call and told them it wasn't his problem. (Id.) Plaintiff claims that his cellmates continued to press the button requesting help, and the Tower Officer finally said he would "look into it." (Id.) Plaintiff complains that it wasn't until approximately 12:24 a.m. that a nurse was called to evaluate him. (Id.) Plaintiff acknowledges that the nurse "immediately took [him] up the hallway to medical away from the situation." (Id.) Plaintiff further acknowledges that he was transported to Saint Mary's Medical Center where he was informed he had a cracked orbital lobe, "needed sinus reconstruction, nasal repair, and plastic surgery to have damage fixed." (Id.) Plaintiff alleges that after he received stitches to repair his face and nose, Plaintiff was returned to the jail between 7:00 a.m. to 7:45 a.m. on August 16, 2020. (Id.)

Plaintiff complains that he was placed in Pod B-6, Cell # 1, without a mat, blanket, or

2

change of clothing. (Id.) Plaintiff states that he was not provided a breakfast tray. (Id.) Plaintiff states that he pressed the call button, but no officer responded. (Id.) Plaintiff acknowledges that around 12:20 p.m. to 1:30 p.m., Officer Workman came into the pod an apologized because he was not notified Plaintiff was placed in the pod. (Id.) Plaintiff states that between 7:30 p.m. to 8:30 p.m., Captain Reid entered the cell to interview Plaintiff regarding the attack. (Id.) Plaintiff again complained that he was not provided with a mat, blanket, or change of clothes. (Id.) Officer Workman advised Plaintiff that he would "handle it" and CO Scheiling and Stepp later entered Plaintiff's pod. (Id.) Plaintiff acknowledges that CO Stepp went to get his mattress from Pod B-8. (Id.) Plaintiff then states that the nurse and Officer Scheiling came by for "med pass," and the nurse advised Officer Scheiling that stitches had came out of Plaintiff's face and he would need to return to the hospital. (Id.) Plaintiff alleges that Officer Scheiling informed Plaintiff he would not be returned to the hospital until Plaintiff changed his bloody clothing. (Id.) Plaintiff acknowledges that Officer Scheiling got him a change of clothes and he was then transported back to the hospital by Officers Steep and Williamson. (Id.) Plaintiff asserts that he was returned to WRJ between 6:30 a.m. to 7:30 a.m. on August 17, 2020, and placed in Pod C-1, Cell # 9. (Id.) Plaintiff complains that he was not provided with a mat or blanket until approximately 3;20 p.m. to 4:30 p.m. on August 21, 2020. (Id.)

Plaintiff alleges that the first week of September 2020, Officer Akers informed Plaintiff he was being moved back to Pod B-8. (Id.) Plaintiff states that he informed Officer Akers that his life would be in danger in that population, and Officer Akers placed Plaintiff in Pod A-7, Cell # 4. (Id.) Plaintiff states that there were five to ten inmates in this Pod, so Officer Akers then moved Plaintiff to Pod A-5, Cell # 3. (Id.) Plaintiff states he remained in this cell until the second week of September 2020, when Officer Akers again came and informed Plaintiff that he was being placed

3

in Pod B-8. (Id.) Plaintiff states that he told Officer Akers he would not go, and Officer Akers "chained [Plaintiff] like a dog to the table." (Id.) Plaintiff acknowledges that when Officer Robinson saw this, he stated "not on my watch, and told him no way would he allow [Plaintiff] to be done like that at all." (Id.) Later that day, Plaintiff alleges that Captain Reid inquired where Plaintiff believed he would be safe and Plaintiff advised "back down on B-7 quarantine." (Id.) Plaintiff acknowledges that he was placed in B-7. (Id.) Plaintiff alleges that he remained in B-7 until his released on bond on October 2, 2020. (Id.)

Plaintiff states that he was again incarcerated on August 2, 2021. (Id.) Plaintiff complains that he was placed in Pod C-4 "where 3 of the people that did the attack" were located. (Id.) Plaintiff indicates that he notified staff of the foregoing, and Captain Reid placed Plaintiff in Pod C-2 for his safety. (Id.) Plaintiff alleges that around the end of September 2021, Plaintiff was moved to Pod A-6, segregation. (Id.) Plaintiff states that a couple of days after being placed in Pod A-6, Plaintiff could not see out of the left eye because it was "highly infected." (Id.) Plaintiff alleges that he "laid in pain and not able to see until the following Monday at which point [Plaintiff] was seen by Dr. Martin." (Id.) Plaintiff contends that Dr. Martin immediately sent him to St. Mary's Medical Center. (Id.) Plaintiff states that the ER doctor prescribed eye drops and a gel for his eye to be applied four to five times a day. (Id.) Upon returning to MOCC, Plaintiff was placed in medical M-5. (Id.) Plaintiff states that while he was in medical, he learned that there was a "stab on sight" for him. (Id.) Plaintiff states he was then moved to M-2, but he still was not provided with his eye drops. (Id.) Plaintiff, however, acknowledges that Nurses Josh, Emily, Amber, Autumn, and Mandy were all trying to get his eye drops. (Id.) Plaintiff complains that on November 3, 2021, the doctor was approaching Plaintiff's door to check on Plaintiff and Nurse Regina Bryant "stopped him and told him [Plaintiff] was not to have the phone, was segregation,

4

and was not to have anything at all." (Id.) Plaintiff states that Nurse Bryant informed the doctor that "she would fix [Plaintiff] soon, when [he] woke up." (Id.) Thus, Plaintiff alleges that Nurse Bryant prevented the doctor from performing his "duties." (Id.) Plaintiff acknowledges that he did not see or hear the foregoing because he was asleep, but this information was provided to Plaintiff by Officer Stafford. (Id.) Plaintiff further states that Officer Stafford informed Plaintiff that Nurse Bryant was talking to Nurse Melissa about having Plaintiff "cleared" and moved down the hallway. (Id.) Officer Stafford informed Plaintiff that Nurse Bryant asked Nurse Melissa to "cover for her if things ever came up that [Plaintiff's] eye drops came in but she was going to stop them, and Melissa agreed." (Id.) Plaintiff alleges that Officer Stafford told him that Nurse Bryant was "dead set on making sure [Plaintiff] was put down the hallway to have something happen to [him] at all costs." (Id.)

On November 5, 2021, Plaintiff states that Officer Cook moved him from medical to Pod B-6, Cell # 8. (Id.) Once Officer Cook left the pod, Plaintiff states that he was immediately approached and threatened by six inmates. (Id.) Plaintiff acknowledges that Officer Racer was in the tower and announced that the inmates exit the room and if anyone touched Plaintiff they would be "charged." (Id.) Officer Racer instructed Plaintiff to lock his cell door and wait for Officer Cook to remove him from the pod. (Id.) Plaintiff acknowledges that was removed from Pod B-6 and placed in Pod C-2, Cell # 1. (Id.) Plaintiff alleges that he remained there until his roommate started asking Plaintiff why "Officers Brent, Cook, and others were asking him to f*ck [Plaintiff] up for the DMI and Odinist gang members." (Id.) Plaintiff states that he was then moved back to segregation for his safety. (Id.) Plaintiff further contends that Officers Prater and Carter have assisted the gang members in their attempt to harm Plaintiff. (Id.)

By Order entered on August 5, 2022, United States Magistrate Judge Cheryl A. Eifert

granted Plaintiff's Application to Proceed Without Prepayment of Fees and Costs and directed the Clerk to issue process for the named Defendants. (Document No. 4.) On December 8, 2022, Plaintiff filed his First Amended Complaint naming the following as Defendants: (1) Admin. Aldridge; (2) Major Fleming; (3) Counselor Stinson, Stevens Center; (4) Officer Zach Priest, WRJ; (5) Officer John Doe; (6) John Doe, Correctional Officer in Tower; (7) Correctional Officer Scheiling; (8) Officer in C-Pod Tower on Saturday, Aug. 17, 2020; (9) Correctional Officer Williamson; (10) Correctional Officer Ackers; (11) Correctional Officer Cook; (12) Nurse Regina Bryant; (13) Nurse Melissa; (14) Correctional Officer Brent; (15) Correctional Officer Carter; (16) Correctional Officer Petticrew; (17) Correctional Officer Gray, Northern Correctional Center; (18) Correctional Officer Counselor Cox, Northern Correctional Center; (19) Counselor Heather Timmins, Northern Correctional Center; and (20) DCR Commissioner Betsy Jividen. (Document No. 23.) Pertinent to the above Motion, Plaintiff asserts the following allegations against Nurse Regina Bryant:

> Nurse Regina Bryant, who was heard by her own staff saying she would "fix me" and she would have me moved down the hallway. Who was on camera [in] medical [on] Nov. 3rd, 2021, approx. 5:00 a.m. – 10:00 p.m., showing Regina Bryant stop the doctor "Dave" [telling] him I was to have no phone. I was to be in seg and not to have anything at all. The camera will show this. Regina Bryant was also heard by Lakin Correctional Officer, CO Stafford, telling a Nurse Melissa she would make sure I was medically cleared and I would be put down the hallway soon as she got her doctor in. She told Melissa that she would need to her help in case anything ever came up that my eye drops came in but she was going to stop them, and she would make her doctor clear me even though I was not ready she would see to it. She was dead set on getting me put down the hallway so I would be delt with, which did in fact happen when CO Cook came and forced me. Regina Bryant put me through pain, suffering, cruel and unusual punishment by not allowing me medication. Mental anguish as well as further pain and physical problems.

(Id., pp. 8 – 9.)

On December 19, 2022, Defendants Aldridge and Fleming filed their Answer. (Document

No. 31.) By Order entered on December 20, 2022, Judge Eifert construed Plaintiff's First Amended Complaint as Motion to Amend Complaint. (Document No. 32.) To the extent Plaintiff requested permission to amend to supplement his factual allegations against Defendants Aldridge and Fleming, Judge Eifert granted the Motion. (Id.) To the extent Plaintiff excluded WRJ in his First Amended Complaint, Judge Eifert directed that the Clerk terminate WRJ as a Defendant. (Id.) To the extent Plaintiff requested permission to add Officer Zach Priest, Officer John Doe, John Doe, Correctional Officer Scheiling, Officer C-Pod Tower, Correctional Officer Williamson, Correctional Officer Ackers, Correctional Officer Cook, Nurse Regina Bryant, Nurse Melissa, Correctional Officer Brent, Correctional Officer Carter, Correctional Officer Petticrew, and DCR Commissioner Betsey Jividen, Judge Eifert granted his Motion and directed the Clerk to issue process.[2] To the extent Plaintiff requested permission to amend to include Counselor Stinson at the Stevens Center, Correctional Officer Gary at the Northern Correctional Center, Counselor Cox at the Northern Correctional Center, and Counselor Heather Timmins at the Northern Correctional Center, Judge Eifert denied his Motion. (Id.) On January 17, 2023, Defendant Bryant filed a Motion for Extension to Time to File Answer and Defendant Petticrew filed his Answer. (Document Nos. 54 and 58.) By Order entered on January 17, 2023, the above matter was transferred to the undersigned for total pretrial management and submission of proposed findings of facts and recommendation for disposition. (Document Nos. 56 and 57.) By Order entered on January 18, 2023, the undersigned granted Defendant Bryant's Motion for Extension of Time.

---

[2] Judge Eifert did not direct the service of Officer John Doe, John Doe, and Officer C-Pod Tower. Plaintiff was notified that it was his responsibility to identify these individuals by their names and failure to do so within a reasonable time would likely result in dismissal of these individuals. (Document No. 32.)

(Document No. 59.)

On January 31, 2023, Defendant Bryant filed her Motion to Dismiss for Failure to State Claim and Alternative Motion for Summary Judgment and Memorandum in Support. (Document Nos. 60 and 61.) Defendant Bryant first argues that Plaintiff's claims do not meet the legal threshold for a viable Eighth Amendment claim. (Id.) In the alternative, Defendant Bryant argues that a review of Plaintiff's medical records reveal there was no Eighth Amendment violation. (Id.) As Exhibits, Defendant Bryant attaches the following: (1) A copy of the Affidavit of Thomas J. Weber, Chief Executive Officer for PrimeCare Medical of West Virginia, Inc. (Document No. 60-1); (2) A copy of Plaintiff's Sick Call requests (Document No. 60-2); (3) A copy of Plaintiff's pertinent medical records from St. Mary's Medical Center (Document No. 60-3); (4) A copy of a Telephone/Verbal Order from Dr. Miller (Document No. 60-4); (5) A copy of Plaintiff's "Chart Notes" (Document No. 60-5); and (6) A copy of Plaintiff's medications from August 2021 until January 2022 (Document No. 60-6).

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on February 1, 2023, advising him of the right to file a response to Defendant Bryant's Motion to Dismiss for Failure to State Claim and Alternative Motion for Summary Judgment by March 1, 2023. (Document No. 62.) The undersigned specifically advised Plaintiff that "failure to respond to Defendant Bryant's Motion may result in a recommendation of denial of the relief sought in the Complaint and dismissal of the suit." (Id.) On February 14, 2023, Defendant Brent and Carter filed their Answer. (Document No. 67.) On March 2, 2023, Defendant Ackers filed his Answer. (Document No. 74.) Plaintiff failed to file a response to Defendant Bryant's Motion to Dismiss for Failure to State Claim and Alternative Motion for Summary Judgment.

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).

Federal Courts are Courts of limited jurisdiction that are empowered to consider cases authorized by Article III of the United States Constitution and statutes enacted by Congress. Bender v. Williamsport Area School District, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). A motion to dismiss filed pursuant to Rule 12(b)(1) raises the question of the federal court's subject matter jurisdiction. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Once subject matter jurisdiction is challenged, plaintiff bears the "burden of proving that subject matter jurisdiction exists." Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). Subject matter jurisdiction cannot be waived by the Court or the parties. The absence of subject-matter jurisdiction

may be raised at any time. Lovern v. Edwards, 190 F.3d 648 (4th Cir. 1999). When considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a District Court may refer to evidence outside the pleadings without converting the proceeding to one for summary judgment. See William v. United States, 50 F.3d 299 (4th Cir. 1995).

### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-moving movant." Wai Man Tom v. Hospitality Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020)(citations omitted.); also see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(A "material fact" is a fact that could affect the outcome of the case); CTB, Inc. v. Hog Slat, Inc., 954 F.3d 647, 658 *4th Cir. 2020)("A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict of the nonmoving party."); FDIC v. Cashion, 720 F.3d 169, 180 (4th Cir. 2013)(A "genuine issue" of material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor). "The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact." Wai Man Tom, 980 F.3d at 1037. The moving party may satisfy this burden by showing that the non-moving party has failed to prove an essential element of the non-moving party's case that the non-moving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(Summary judgment is required when a party fails to make a showing sufficient

10

to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim.). Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. See Celotex Corp., 477 U.S. at 325, 106 S.Ct. 2548; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986); also see Wai Man Tom, 980 F.3d at 1037(citation omitted)("[T]o survive the motion for summary judgment, [the non-moving party] may not rest on the allegations averred in his pleadings. Rather, the nonmoving party must demonstrate specific, material facts exist that give rise to a genuine issue.") Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson, 477 U.S. at 247-48, 106 S.Ct. 2505("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); Perry v. Kappos, 2012 WL 2130908, * 3 (4th Cir. 2012)(quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)("At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action.") All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356; also see Sedar v. Reston Town Center Property, LLC, 988 F.3d 756, 763 (4th Cir. 2021)("The requirement to construe the facts, and all reasonable inferences therefrom, in the light most favorable to the non-moving party does not require [the court] to accept cherry-picked snippets of the testimony divorced from their context."). Additionally, the court is not allowed to make credibility determinations or weigh the evidence at the summary judgment stage. Stanton v. Elliott, 25 F.4th 227, 234 (4th Cir. 2022)(noting that the

disbelief in a non-moving party's ability to succeed on the merits is insufficient to grant summary judgment). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate. See Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993)(Summary judgment is proper where it is apparent from the record that "no reasonable jury could find for the nonmoving party.")

## ANALYSIS

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Title 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." Thus, Section 1983 provides a "broad remedy for violations of federally protected civil rights." Monell v. Dep't of Social Services, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally speaking, to state and prevail upon a claim under 42 U.S.C. § 1983, a Plaintiff must prove that (1) a person acting under color of State law (2) committed an act which deprived him of an alleged right, privilege or immunity protected by the Constitution or laws of the United States. Construing Plaintiff's Complaint and Amended Complaint liberally, the undersigned finds that Plaintiff is asserting an Eighth Amendment claim of deliberate indifference to his safety and medical needs concerning Defendant Bryant.

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take

12

reasonable measures to guarantee the safety of the inmates.'")(quoting Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain.

13

Id.; also see Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 *1ˢᵗ Cir. 1990)("A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."); Morales Feliciano v. Calderson Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004)("A constitutional violation is . . . established when government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medication attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort, or a threat to good health.") The Fourth Circuit stated the applicable standard in Miltier v. Beorn, 896 F.2d 848, 851 - 852 (4ᵗʰ Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

Miltier v. Born, 896 F.2d 848, 851 - 52 (4ᵗʰ Cir. 1990)(*recognized in* Sharpe v. South Carolina Dept. of Corr., 621 Fed.Appx. 732, 733 (4ᵗʰ Cir. 2015) *as overruled in part on other grounds by* Farmer, 511 U.S. at 837, 114 S.Ct. 1970); See also Sosebee v. Murphy, 797 F.2d 179, 183 (4ᵗʰ Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding deliberate indifference to inmate's medical needs.); Loe v. Armistead, 582 F.2d 1291 (4ᵗʰ Cir. 1978), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a

reasonable basis for inferring deliberate indifference to his serious medical needs.); <u>Russell v. Sheffer</u>, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.) Therefore, Plaintiff must first allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. <u>See</u> <u>Farmer</u>, *supra*, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, *supra*, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must therefore allege and establish that each Defendant was aware that he was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

Liberally construing Plaintiff's Complaint and Amended Complaint, Plaintiff alleges that Defendant Bryant acted with deliberate indifference by denying Plaintiff his eye medication and having him moved from the medical unit to general population. For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, a condition for which lack of treatment causes continuous severe pain or significantly affects an individual's daily life activities, or a condition diagnosed as mandating treatment or obviously requiring medical attention. In her Motion, Defendant Bryant acknowledges that Plaintiff's corneal ulcer "is arguably serious." (Document No. 61, p. 5.)

15

Accordingly, the undersigned will assume for purposes of this motion that Plaintiff's condition was serious enough to give rise to an Eighth Amendment claim.

Next, the undersigned will consider whether Defendant Bryant acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. To satisfy the subjective component, Plaintiff must allege each Defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff contends that Defendant Bryant acted with deliberate indifference in by denying Plaintiff his medication for his corneal ulcer and having him moved from the medical unit. Defendant Bryant argues "there is no evidence, other than [Plaintiff's] bald assertion that Nurse Bryant deliberately denied his medication and then had him moved from the medical unit to general population." (Document No. 61, p. 5.) First, Defendant Bryant asserts that "the decision to change [Plaintiff's] housing assignment was not made by Nurse Bryant, nor by her employer, PrimeCare of West Virginia, Inc., the agency that, during the relevant time period, contracted with the State of West Virginia to provide medical services at the Western Regional Jail." (Id.) In support, Defendant Bryant attaches the Affidavit of Thomas J. Weber, Chief Executive Officer of PrimeCare Medical of West Virginia, Inc. (Document No. 60-1.) Mr. Weber stated that in his capacity as Chief Executive Officer of PrimeCare, he is familiar with the operations and policies related to the provision of health care services at the WRJ. (Id.) Mr. Weber further states, in pertinent part, as follows:

***

5.    Employees of PrimeCare Medical of West Virginia, Inc. do not make housing decisions for inmates at the Western Regional Jail, nor at any of the regional jails where PrimeCare providers medical services in West Virginia.

6.    Housing decisions are made by employees of the West Virginia Department of Corrections and Rehabilitation.

***

16

Plaintiff failed to file a response disputing the foregoing. Additionally, Plaintiff appears to acknowledge that the change in his housing decision was made by a WRJ employee. In his Amended Complaint, Plaintiff states that "CO Cook came and forced" him to move to general population. Furthermore, there is no allegation or indication that Plaintiff was attacked, injured, or his medication condition aggravated as a result of the change in his housing assignment. Based upon the undisputed facts, the undersigned finds that Defendant Bryant did not act with deliberate indifference concerning Plaintiff's housing assignment.

Next, the undersigned will consider Plaintiff's claim that Defendant Bryant acted with deliberate indifference by denying Plaintiff his medication for his corneal ulcer. The undisputed medical records reveal that Plaintiff received his medications several times a day from October 27, 2021, through November 5, 2021. On October 19, 2021, Plaintiff first reported complaints of left eye pain and irritation. (Document No. 60-5, p. 4.) Plaintiff was examined by LPH Joshua Hughes, who flushed Plaintiff's eye. (Id.) On October 21, 2021, LPN Melissa Bragg noted that she was called to Pod A6 to check on Plaintiff. (Id.) Upon arriving, LPN Bragg noted that Plaintiff was laying on the cell floor stating that he was hot and sick to his stomach. (Id.) LPN Bragg indicated that Plaintiff had vomited prior to her arrival. (Id.) Plaintiff also complained of eye pain and that the opposite side of his face was swelling. (Id.) LPN Bragg noted that Plaintiff's "face looked as though he may have an abscess but could not be certain." (Id.) It was noted that medication was issued. (Id.) On October 25, 2021, Plaintiff was evaluated Dr. Joye Martin regarding complaints of pain and redness of his left eye for approximately one week. (Document No. 60-2, p. 4.) Upon examination, Dr. Martin noted redness to the sclera and around the eye lid, positive photophobia, iris and pupil clouded, and compromised vision. (Id.) Dr. Martin ordered that Plaintiff be transported to the ER. (Id.) On the same day, Plaintiff was transported to the Emergency

Department at St. Mary's Medical Center. (Document No. 60-3.) Plaintiff was examined and diagnosed with a corneal ulcer to his left eye. (Id.) Plaintiff was prescribed one tube of Erythromycin ointment to be applied to the left eye four times a day and one bottle of Ketorolac drops for application of one drop up to three times a day as needed for pain.[3] (Id.) On October 26, 2021, Plaintiff was returned to WRJ and housed in the medical unit. (Document No. 60-2, p. 3.) PA Davis Miller indicated that St. Mary's Medical Center diagnosed Plaintiff with a corneal ulcer and prescribed medication for treatment. (Id.) PA Miller noted that Plaintiff voiced no complaints, there was no acute distress, and the plan was to monitor and continue the current treatment plan. (Id.) On the same day, Dr. Martin entered a telephone order for Plaintiff to continue his prescribed medications from St. Mary's Medical Center for seven days. (Document No. 60-4.) LPN Susie Christian further noted that they were awaiting the arrival of Plaintiff's medications. (Document No. 60-5, p. 4.) On October 27, 2021, Dr. Martin examined Plaintiff noting that his "left eye [was] still very red and painful with photophobia." (Document No. 60-2, p. 3.) Dr. Martin further noted that Plaintiff's eye medications just "came in his AM and they are to be started today." (Id.) LPN Christian noted that the "Erythromycin ointment came in today and patient received [first] dose during assessment. Patient stated feeling better already." (Document No. 60-5, p. 4.) The medical records reveal that Plaintiff received two applications of the Erythromycin ointment and one application of the Ketorolac drops on October 27, 2021. (Document No. 60-6, pp. 1 – 2.) On October 28, 2021, PA Miller evaluated Plaintiff noting no complaints voiced and no acute distressed. (Document No. 60-2, p. 3.) PA Miller indicated that the current treatment plan would be continued and Plaintiff's condition would continue to be monitored. (Id., pp. 2 – 3.) Also on

---

[3] Plaintiff was prescribed a 10 day supply of the Erythromycin ointment and a 5 day supply of the Ketorolac drops. (Document No. 60-3.)

October 28, 2021, LPN Christian and RN April Morales noted that Plaintiff was continuing to receive his eye medication and reported no complaints. (Document No. 60-5, p. 3.) The medical records reveal that Plaintiff received three applications of the Erythromycin ointment and one application of the Ketorolac drops. (Document No. 60-6, pp. 1 – 2.)

On October 29, 2021, LPN Hughes and RN Morales completed medical assessments and noted that Plaintiff denied any issues and voiced no complaints. (Document No. 60-5, p. 3.) The medical records reveal that Plaintiff received three applications of the Erythromycin ointment. (Document No. 60-6, pp. 1 – 2.) LPN Autumn Johnson noted that "non formulary completed for eye drops. Faxed medical ticket to Boswell." (Document No. 60-5, p. 3.) On October 30, 2023, LPN Emily Bradshaw and LPN Taylor Forgony completed medical assessments and noted that Plaintiff denied any issues and voiced no complaints. (Id.) The medical records reveal that Plaintiff received three applications of the Erythromycin ointment and one application of the Ketorolac drops. (Document No. 60-6, pp. 1 – 2.) On October 31, 2023, LPN Bragg, LPN Bradshaw, and LPN Autumn Johnson completed medical assessments and noted that Plaintiff denied any issues and voiced no complaints. (Document No. 60-5, p. 2.) The medical records reveal that Plaintiff received four applications of the Erythromycin ointment and no Ketorolac drops because such "have not received from Boswell." (Document No. 60-6, pp. 1 – 2.) On November 1, 2021, LPN Ericka Salyers, RN Christian Taylor, RN Morales completed medical assessments and noted that Plaintiff denied any issues and voiced no complaints. (Document No. 60-5, p. 2.) .) The medical records reveal that Plaintiff received three applications of the Erythromycin ointment on November 1, 2021. (Document No. 60-6, pp. 1 – 2.)

At approximately 1:00 p.m. on November 2, 2021, PA Miller noted that Plaintiff reported he had not received his eye ointment that day. (Document No. 60-2, p. 2.) Plaintiff further

complained of "no improvement" of symptoms, still being unable to open his eye, pain, and blurry vision. (Id.) PA Miller noted that Plaintiff still had three more days of medication and his current treatment plan should be continued. (Id.) PA Miller indicated that if Plaintiff was still experiencing symptoms at the conclusion of the medication regiment, it might be necessary to refer Plaintiff to an ophthalmologist for evaluation. (Id.) At approximately 2:30 p.m. and 7:00 p.m. on November 2, 2021, LPN Hughes and LPN Forgony completed medical assessments and noted that Plaintiff denied any issues and voiced no complaints. (Document No. 60-5, p. 1.) At approximately 11:45 p.m. on November 2, 2021, RN Morales completed a medical assessment and noted that Plaintiff was "wanting [his] eye medication but it is not time for administration." (Id.) The medical records reveal that Plaintiff received three applications of the Erythromycin ointment on November 2, 2021. (Document No. 60-6, pp. 1 – 2.)

On November 3, 2021, Plaintiff received three applications of the Erythromycin ointment and one application of the Ketorolac drops. (Id.) At approximately 5:20 p.m. on November 3, 2021, LPN Amanda Simmons completed a medical assessment and noted that Plaintiff "stated his left eye was hurting but just received his ointment and it helped relieve some of the discomfort." (Document No. 60-5, p. 1.) At approximately 11:55 p.m. on November 3, 2021, RN Morales completed a medical assessment and noted that Plaintiff denied any issues. (Id.) On November 4, 2021, Plaintiff received three applications of the Erythromycin ointment and one application of the Ketorolac drops. (Document No. 60-6, pp. 1 – 2.) Additionally, Plaintiff was seen by PA Miller on November 4, 2021. (Document No. 60-2, p. 2.) PA Miller noted no complaints voiced and no acute distressed. (Id.) PA Miller indicated that the current treatment plan would be continued and Plaintiff's condition would continue to be monitored. (Id., pp. 2 – 3.) On November 5, 2021, Plaintiff received two applications of the Erythromycin ointment and one application of the

Ketorolac drops. (Document No. 60-6, pp. 1 – 2.) At approximately 12:30 a.m. on November 5, 2021, RN Morales completed a medical assessment and noted that Plaintiff denied any issues. (Document No. 60-5, p. 1.) At approximately 11:50 p.m. on November 5, 2021, LPN Simmons noted that Plaintiff was brought to medical for eye ointment after PM count cleared, the ointment was put in the affected eye, and Plaintiff tolerated it well. (Id.) On November 8, 2021, Plaintiff was evaluated by Dr. Alfred Baldera. (Document No. 60-2, p. 1.) Dr. Baldera noted that Plaintiff had completed his eye medications but still complained of blurry vision and pain. (Id.) Dr. Baldera noted that Plaintiff's cornea appeared "grossly normal." (Id.) Finally, Baldera indicated that Plaintiff had been "scheduled for ophthalmology evaluation [in] near future." (Id.) On December 1, 2021, Plaintiff was evaluated by Dr. Martin. (Id.) Dr. Martin noted that Plaintiff reported concerns regarding his left eye. (Id.) Specifically, Plaintiff indicated that his vision was still blurry but it was no longer painful or red. (Id.) Dr. Martin noted that Plaintiff continued to experience photophobia and was supposed to follow up with an ophthalmologist. (Id.) Dr. Martin indicated that a referral to an ophthalmologist was needed to "check status of his cornea and to also rule out iritis." (Id.)

Based upon the foregoing, the Court finds that Defendant Bryant did not act with deliberate indifference concerning Plaintiff's eye medications. Although Plaintiff concludes that Defendant Bryant caused Plaintiff to be denied his eye medications, the undisputed record does not support such a conclusion. The undisputed evidence reveals that once Plaintiff's prescription for the Erythromycin ointment was received on October 27, 2021, medical staff administered the medication the same day and such was administered two to four times a day for ten days. The record further reveals that Plaintiff received the Ketorolac drops for pain as needed. The record fails to contain any indication that Plaintiff complained that Defendant Bryant, or other medical

staff, were intentionally refusing to provide Plaintiff with his eye medications. The undersigned, therefore, finds no evidence that Defendant Bryant knowingly disregarded Plaintiff's need for his eye medication. At most, Plaintiff appears to simply disagree with the appropriate course of treatment. An inmate's disagreement with his medical care or the course of treatment is insufficient to support a deliberate indifference claim, and questions of medical judgment are not subject to judicial review. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation.") Based upon the undisputed facts, the undersigned finds that Defendant Bryant did not act with deliberate indifference concerning Plaintiff's housing assignment or the alleged denial of his eye medication. Thus, the undersigned respectfully recommends that Defendant Bryant's "Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment" (Document No. 60) be granted.

## **PROPOSAL AND RECOMMENDATION**

The undersigned therefore hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Defendant Bryant's "Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment" (Document No. 60), and **REFER** the matter back to the undersigned for further proceedings as to the remaining Defendants.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Robert C. Chambers. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Chambers and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: June 8, 2023.

Omar J. Aboulhosn
United States Magistrate Judge