**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

RANDALL LEE MAYS,                              )
                                               )
           Plaintiff,                          )
v.                                             )        **Civil Action No. 3:22-00319**
                                               )
ADMINISTRATOR CARL ALDRIDGE, *et al.*,         )
                                               )
           Defendants.                         )

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before the Court is Defendants Aldridge, Fleming, Ackers, Brent, Carter, and

Petticrew's Motion for Summary Judgment (Document No. 92), filed on July 18, 2023. The Court

notified Plaintiff pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had

the right to file a response to Defendants' Motion and submit Affidavit(s) or statements and/or

other legal or factual material supporting his claims as they are challenged by the Defendants in

moving to dismiss. (Document No. 94.) On July 26, 2023, Plaintiff filed a Response/Answer to

Defendants' Motion. (Document No. 95.) On August 14, 2023, Plaintiff filed his Response in

Opposition to Defendants' Motion. (Document No. 100.) Having examined the record and

considered the applicable law, the undersigned has concluded that Defendants Aldridge, Fleming,

Ackers, Brent, Carter, and Petticrew's Motion (Document No. 92) should be granted.

**PROCEDURAL BACKGROUND**

On August 4, 2022, Plaintiff, acting *pro se*,[1] filed his Application to Proceed Without

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent
standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v.
Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Prepayment of Fees or Costs (Document No. 1) and Complaint for alleged violations of his constitutional rights pursuant to 42 U.S.C. § 1983 (Document No. 2). In his Complaint, Plaintiff names the following as Defendants: (1) Western Regional Jail; (2) Admin. Aldridge; and (3) Major Fleming. (Document No. 2.) Plaintiff alleges that he was severely beaten by inmate gang members during his confinement at the Western Regional Jail ("WRJ") on August 15, 2020. (Id.) Plaintiff states as follows: "I was beaten. I was stripped down and all my clothes were taken off. They held me down and beat me. They took turns holding my head up so they could put their d*cks on my face, and force me to hold their d*cks in my hand while others stood over me and rubbed their d*cks on my body and over my a**." (Id.) Plaintiff explains that the beating began around 5:30 p.m. and lasted for hours. (Id.) Plaintiff alleges he passed out from "blood loss." (Id.) Plaintiff states that around 10:50 p.m., an officer came into the pod and announced lockdown. (Id.) Plaintiff claims that he approached the officer and requested help, but the officer "grabbed [Plaintiff] by the shirt and put [him] back into the cell." (Id.) Plaintiff states that the left side of his nose was severely cut and was hanging off his face. (Id.) Plaintiff asserts that he "fell on the floor, and the roommates pushed the button to get [him] help because the people that attacked [Plaintiff] were no longer in the room." (Id.) Plaintiff alleges that Tower Officer Z. Priest answered the call and told them it wasn't his problem. (Id.) Plaintiff claims that his cellmates continued to press the button requesting help, and the Tower Officer finally said he would "look into it." (Id.) Plaintiff complains that it wasn't until approximately 12:24 a.m. that a nurse was called to evaluate him. (Id.) Plaintiff acknowledges that the nurse "immediately took [him] up the hallway to medical away from the situation." (Id.) Plaintiff further acknowledges that he was transported to Saint Mary's Medical Center where he was informed that he had a cracked orbital lobe, "needed sinus

reconstruction, nasal repair, and plastic surgery to have damage fixed." (Id.) Plaintiff alleges that after he received stitches to repair his face and nose, Plaintiff was returned to the jail between 7:00 a.m. to 7:45 a.m. on August 16, 2020. (Id.)

Plaintiff complains that he was placed in Pod B-6, Cell # 1, without a mat, blanket, or change of clothing. (Id.) Plaintiff states that he was not provided a breakfast tray. (Id.) Plaintiff states that he pressed the call button, but no officer responded. (Id.) Plaintiff acknowledges that around 12:20 p.m. to 1:30 p.m., Officer Workman came into the pod an apologized because he was not notified Plaintiff was placed in the pod. (Id.) Plaintiff states that between 7:30 p.m. to 8:30 p.m., Captain Reid entered the cell to interview Plaintiff regarding the attack. (Id.) Plaintiff again complained that he was not provided with a mat, blanket, or change of clothes. (Id.) Officer Workman advised Plaintiff that he would "handle it" and CO Scheiling and Stepp later entered Plaintiff's pod. (Id.) Plaintiff acknowledges that CO Stepp went to get his mattress from Pod B-8. (Id.) Plaintiff then states that the nurse and Officer Scheiling came by for "med pass," and the nurse advised Officer Scheiling that stitches had come out of Plaintiff's face and he would need to return to the hospital. (Id.) Plaintiff alleges that Officer Scheiling informed Plaintiff he would not be returned to the hospital until Plaintiff changed his bloody clothing. (Id.) Plaintiff acknowledges that Officer Scheiling got him a change of clothes and he was then transported back to the hospital by Officers Steep and Williamson. (Id.) Plaintiff asserts that he was returned to WRJ between 6:30 a.m. to 7:30 a.m. on August 17, 2020, and placed in Pod C-1, Cell # 9. (Id.) Plaintiff complains that he was not provided with a mat or blanket until approximately 3;20 p.m. to 4:30 p.m. on August 21, 2020. (Id.)

Plaintiff alleges that the first week of September 2020, Officer Ackers informed Plaintiff

he was being moved back to Pod B-8. (Id.) Plaintiff states that he informed Officer Ackers that his life would be in danger in that population, and Officer Ackers placed Plaintiff in Pod A-7, Cell # 4. (Id.) Plaintiff states that there were five to ten inmates in this Pod, so Officer Ackers then moved Plaintiff to Pod A-5, Cell # 3. (Id.) Plaintiff states he remained in this cell until the second week of September 2020, when Officer Ackers again came and informed Plaintiff that he was being placed in Pod B-8. (Id.) Plaintiff states that he told Officer Ackers he would not go, and Officer Ackers "chained [Plaintiff] like a dog to the table." (Id.) Plaintiff acknowledges that when Officer Robinson saw this, he stated "not on my watch, and told him no way would he allow [Plaintiff] to be done like that at all." (Id.) Later that day, Plaintiff alleges that Captain Reid inquired where Plaintiff believed he would be safe and Plaintiff advised "back down on B-7 quarantine." (Id.) Plaintiff acknowledges that he was placed in B-7. (Id.) Plaintiff alleges that he remained in B-7 until his released on bond on October 2, 2020. (Id.)

Plaintiff states that he was again incarcerated on August 2, 2021. (Id.) Plaintiff complains that he was placed in Pod C-4 "where 3 of the people that did the attack" were located. (Id.) Plaintiff indicates that he notified staff of the foregoing, and Captain Reid placed Plaintiff in Pod C-2 for his safety. (Id.) Plaintiff alleges that around the end of September 2021, Plaintiff was moved to Pod A-6, segregation. (Id.) Plaintiff states that a couple of days after being placed in Pod A-6, Plaintiff could not see out of the left eye because it was "highly infected." (Id.) Plaintiff alleges that he "laid in pain and not able to see until the following Monday at which point [Plaintiff] was seen by Dr. Martin." (Id.) Plaintiff contends that Dr. Martin immediately sent him to St. Mary's Medical Center. (Id.) Plaintiff states that the ER doctor prescribed eye drops and a gel for his eye to be applied four to five times a day. (Id.) Upon returning to MOCC, Plaintiff was placed

in medical M-5. (Id.) Plaintiff states that while he was in medical, he learned that there was a "stab on sight" for him. (Id.) Plaintiff states he was then moved to M-2, but he still was not provided with his eye drops. (Id.) Plaintiff, however, acknowledges that Nurses Josh, Emily, Amber, Autumn, and Mandy were all trying to get his eye drops. (Id.) Plaintiff complains that on November 3, 2021, the doctor was approaching Plaintiff's door to check on Plaintiff and Nurse Regina Bryant "stopped him and told him [Plaintiff] was not to have the phone, was segregation, and was not to have anything at all." (Id.) Plaintiff states that Nurse Bryant informed the doctor that "she would fix [Plaintiff] soon, when [he] woke up." (Id.) Thus, Plaintiff alleges that Nurse Bryant prevented the doctor from performing his "duties." (Id.) Plaintiff acknowledges that he did not see or hear the foregoing because he was asleep, but this information was provided to Plaintiff by Officer Stafford. (Id.) Plaintiff further states that Officer Stafford informed Plaintiff that Nurse Bryant was talking to Nurse Melissa about having Plaintiff "cleared" and moved down the hallway. (Id.) Officer Stafford informed Plaintiff that Nurse Bryant asked Nurse Melissa to "cover for her if things ever came up that [Plaintiff's] eye drops came in but she was going to stop them, and Melissa agreed." (Id.) Plaintiff alleges that Officer Stafford told him that Nurse Bryant was "dead set on making sure [Plaintiff] was put down the hallway to have something happen to [him] at all costs." (Id.)

On November 5, 2021, Plaintiff states that Officer Cook moved him from medical to Pod B-6, Cell # 8. (Id.) Once Officer Cook left the pod, Plaintiff states that he was immediately approached and threatened by six inmates. (Id.) Plaintiff acknowledges that Officer Racer was in the tower and announced that the inmates exit the room and if anyone touched Plaintiff they would be "charged." (Id.) Officer Racer instructed Plaintiff to lock his cell door and wait for Officer Cook

to remove him from the pod. (Id.) Plaintiff acknowledges that was removed from Pod B-6 and placed in Pod C-2, Cell # 1. (Id.) Plaintiff alleges that he remained there until his roommate started asking Plaintiff why "Officers Brent, Cook, and others were asking him to f*ck [Plaintiff] up for the DMI and Odinist gang members." (Id.) Plaintiff states that he was then moved back to segregation for his safety. (Id.) Plaintiff further contends that Officers Prater and Carter have assisted the gang members in their attempt to harm Plaintiff. (Id.)

By Order entered on August 5, 2022, United States Magistrate Judge Cheryl A. Eifert granted Plaintiff's Application to Proceed Without Prepayment of Fees and Costs and directed the Clerk to issue process for the named Defendants. (Document No. 4.) On December 8, 2022, Plaintiff filed his First Amended Complaint naming the following as Defendants: (1) Admin. Aldridge; (2) Major Fleming; (3) Counselor Stinson, Stevens Center; (4) Officer Zach Priest, WRJ; (5) Officer John Doe; (6) John Doe, Correctional Officer in Tower; (7) Correctional Officer Scheiling; (8) Officer in C-Pod Tower on Saturday, Aug. 17, 2020; (9) Correctional Officer Williamson; (10) Correctional Officer Ackers; (11) Correctional Officer Cook; (12) Nurse Regina Bryant; (13) Nurse Melissa; (14) Correctional Officer Brent; (15) Correctional Officer Carter; (16) Correctional Officer Petticrew; (17) Correctional Officer Gray, Northern Correctional Center; (18) Correctional Officer Counselor Cox, Northern Correctional Center; (19) Counselor Heather Timmins, Northern Correctional Center; and (20) DCR Commissioner Betsy Jividen. (Document No. 23.) In his Amended Complaint, Plaintiff clarified his allegations against each Defendant.

On December 19, 2022, Defendants Aldridge and Fleming filed their Answer. (Document No. 31.) By Order entered on December 20, 2022, Judge Eifert construed Plaintiff's First Amended Complaint as Motion to Amend Complaint. (Document No. 32.) To the extent Plaintiff requested

6

permission to amend to supplement his factual allegations against Defendants Aldridge and Fleming, Judge Eifert granted the Motion. (Id.) To the extent Plaintiff excluded WRJ in his First Amended Complaint, Judge Eifert directed that the Clerk terminate WRJ as a Defendant. (Id.) To the extent Plaintiff requested permission to add Officer Zach Priest, Officer John Doe, John Doe, Correctional Officer Scheiling, Officer C-Pod Tower, Correctional Officer Williamson, Correctional Officer Ackers, Correctional Officer Cook, Nurse Regina Bryant, Nurse Melissa, Correctional Officer Brent, Correctional Officer Carter, Correctional Officer Petticrew, and DCR Commissioner Betsey Jividen, Judge Eifert granted his Motion and directed the Clerk to issue process.[2] To the extent Plaintiff requested permission to amend to include Counselor Stinson at the Stevens Center, Correctional Officer Gary at the Northern Correctional Center, Counselor Cox at the Northern Correctional Center, and Counselor Heather Timmins at the Northern Correctional Center, Judge Eifert denied his Motion. (Id.) On January 17, 2023, Defendant Bryant filed a Motion for Extension to Time to File Answer and Defendant Petticrew filed his Answer. (Document Nos. 54 and 58.) By Order entered on January 17, 2023, the above matter was transferred to the undersigned for total pretrial management and submission of proposed findings of facts and recommendation for disposition. (Document Nos. 56 and 57.) By Order entered on January 18, 2023, the undersigned granted Defendant Bryant's Motion for Extension of Time. (Document No. 59.)

On January 31, 2023, Defendant Bryant filed her Motion to Dismiss for Failure to State Claim and Alternative Motion for Summary Judgment and Memorandum in Support. (Document

---

[2] Judge Eifert did not direct the service of Officer John Doe, John Doe, and Officer C-Pod Tower. Plaintiff was notified that it was his responsibility to identify these individuals by their names and failure to do so within a reasonable time would likely result in dismissal of these individuals. (Document No. 32.)

Nos. 60 and 61.) As Exhibits, Defendant Bryant attaches the following: (1) A copy of the Affidavit of Thomas J. Weber, Chief Executive Officer for PrimeCare Medical of West Virginia, Inc. (Document No. 60-1); (2) A copy of Plaintiff's Sick Call requests (Document No. 60-2); (3) A copy of Plaintiff's pertinent medical records from St. Mary's Medical Center (Document No. 60-3); (4) A copy of a Telephone/Verbal Order from Dr. Miller (Document No. 60-4); (5) A copy of Plaintiff's "Chart Notes" (Document No. 60-5); and (6) A copy of Plaintiff's medications from August 2021 until January 2022 (Document No. 60-6). Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on February 1, 2023, advising him of the right to file a response to Defendant Bryant's Motion to Dismiss for Failure to State Claim and Alternative Motion for Summary Judgment by March 1, 2023. (Document No. 62.) On February 14, 2023, Defendant Brent and Carter filed their Answer. (Document No. 67.) On March 2, 2023, Defendant Ackers filed his Answer. (Document No. 74.) On June 7, 2023, Plaintiff filed a Motion to Compel Evidence. (Document No. 84.) By Proposed Findings and Recommendation ("PF&R") entered on June 8, 2023, the undersigned recommended that Defendant Bryant's Motion to Dismiss for Failure to State Claim and Alternative Motion for Summary Judgment (Document No. 60) be granted and the matter referred back to the undersigned for further proceedings as to the remaining Defendants. (Document No. 86.) On June 26, 2023, Defendants Aldridge, Fleming, Ackers, Brent, Carter, Petticrew, and Bryant filed Responses in Opposition to Plaintiff's Motion to Compel. (Document Nos. 87 and 88.) By Memorandum Opinion and Order entered on June 28, 2023, United States District Judge Robert C. Chambers adopted the undersigned's PF&R and granted Defendant Bryant's Motion to Dismiss for Failure to State Claim and Alternative Motion for Summary Judgment (Document No. 60). (Document No. 90.)

On July 19, 2023, Defendants Aldridge, Fleming, Ackers, Brent, Carter, and Petticrew filed a Motion for Summary Judgment and Memorandum in Support. (Document Nos. 92 and 93.) In support, Defendants argue as follows: (1) "Plaintiff has failed to state a claim as a matter of law for violations of the Eighth Amendment against all Defendants" (Id., pp. 3 – 5.); and (2) "To the extent Plaintiff fails to allege he suffered a physical injury and his claims for money damages must be dismissed under 42 U.S.C. § 1997e(e)" (Id., pp. 5 – 6.) As an Exhibit, Defendants filed a copy of pertinent pages from the transcript of Plaintiff's deposition. (Document No. 92-1.) Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on July 21, 2023, advising him of the right to file a response to Defendants Aldridge, Fleming, Ackers, Brent, Carter, and Petticrew's Motion for Summary Judgment by March 1, 2023. (Document No. 94.) On July 26, 2023, Plaintiff filed his "Answer to Defendants' Summary Judgment." (Document No. 95.) By Order entered on August 9, 2023, the undersigned denied Plaintiff's Motion to Compel Evidence. (Document No. 99.) On August 14, 2023, Plaintiff filed his "Objection for Defendants' Motion for Summary Judgment." (Document No. 100.)

## <u>THE STANDARD</u>

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-moving movant." Wai Man Tom v. Hospitality Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020)(citations omitted.); also see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(A

"material fact" is a fact that could affect the outcome of the case); CTB, Inc. v. Hog Slat, Inc., 954 F.3d 647, 658 *4th Cir. 2020)("A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict of the nonmoving party."); FDIC v. Cashion, 720 F.3d 169, 180 (4th Cir. 2013)(A "genuine issue" of material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor). "The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact." Wai Man Tom, 980 F.3d at 1037. The moving party may satisfy this burden by showing that the non-moving party has failed to prove an essential element of the non-moving party's case that the non-moving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim.). Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. See Celotex Corp., 477 U.S. at 325, 106 S.Ct. 2548; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986); also see Wai Man Tom, 980 F.3d at 1037(citation omitted)("[T]o survive the motion for summary judgment, [the non-moving party] may not rest on the allegations averred in his pleadings. Rather, the nonmoving party must demonstrate specific, material facts exist that give rise to a genuine issue.") Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson, 477 U.S. at 247-48, 106 S.Ct. 2505("The mere existence of

10

a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); Perry v. Kappos, 2012 WL 2130908, * 3 (4th Cir. 2012)(quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)("At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action.") All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356; also see Sedar v. Reston Town Center Property, LLC, 988 F.3d 756, 763 (4th Cir. 2021)("The requirement to construe the facts, and all reasonable inferences therefrom, in the light most favorable to the non-moving party does not require [the court] to accept cherry-picked snippets of the testimony divorced from their context."). Additionally, the court is not allowed to make credibility determinations or weigh the evidence at the summary judgment stage. Stanton v. Elliott, 25 F.4th 227, 234 (4th Cir. 2022)(noting that the disbelief in a non-moving party's ability to succeed on the merits is insufficient to grant summary judgment). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate. See Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993)(Summary judgment is proper where it is apparent from the record that "no reasonable jury could find for the nonmoving party.")

## ANALYSIS

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Title 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." Thus, Section 1983 provides a "broad remedy

11

for violations of federally protected civil rights." <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally speaking, to state and prevail upon a claim under 42 U.S.C. § 1983, a Plaintiff must prove that (1) a person acting under color of State law (2) committed an act which deprived him of an alleged right, privilege or immunity protected by the Constitution or laws of the United States.

Pertinent to the above Motion for Summary Judgment, Plaintiff asserts the following allegations against Defendant Aldridge: "Who despite calls and talks from Ray Nolan continued to force me into situations to be attacked and hurt. Put me into further cruel and unusual punishment. Stress, mental anguish." (Document No. 23, p. 1.)

Concerning Defendant Fleming, Plaintiff alleges that Defendant Fleming was repeatedly notified by Attorney Ray Nolan and Plaintiff's friends that there were threats on Plaintiff's life. (<u>Id.</u>) Plaintiff, however, alleges that Defendant Fleming "continued to go out of his way and put [Plaintiff's] life in danger." (<u>Id.</u>) Plaintiff complains that Defendant Fleming "made COs write [Plaintiff] up because [he] refused to go back into places where [he] would be attacked and sexually assaulted again." (<u>Id.</u>) Plaintiff states the foregoing writing ups "put [Plaintiff] again through the pain and suffering of having [his] phone turned off resulting in cruel and unusual punishment." (<u>Id.</u>) Plaintiff states that the "write up affected [him] once [he] was moved to prison by hurting [Plaintiff's] classification[3] by 2 points which caused [Plaintiff] to be put again around the friends

---

[3] It is well recognized that **Error! Main Document Only.**prisoners have no constitutional or inherent right to receive a particular security or custody classification. *See Moody v. Daggett*, 429 U.S. 78, 88, n. 9, 97 S.Ct. 274, 279, n. 9, 50 L.Ed.2d 236 (1976)("[N]o due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a 'grievous loss' upon the inmate. The same is true of prisoner classification and eligibility for rehabilitative programs in the federal system."). The Fourth Circuit has specifically stated that "[t]he federal constitution itself vests no liberty interest in inmates retaining or receiving any particular security or custody status '[a]s long as the [challenged] conditions or degree of confinement . . . is within the sentence imposed

of the attackers, caused [him] hardship, and has put [him] through mental anguish." (Id.)

Concerning Defendant Ackers, Plaintiff alleges that Defendant Ackers threatened to move Plaintiff back to B-8. (Id., p. 5.) Plaintiff alleges that the first week of September, Defendant Ackers informed Plaintiff that he was going to be moved from C-Pod back to B-8. (Id.) Plaintiff states that Defendant Ackers then moved him to A-7 Pod, Cell 4, and locked Plaintiff down. (Id.) Plaintiff asserts that he "became stressed, scared, and was forced to be screamed at and put [him] through further mental anguish by forcing [him] into a Pod where there were people who did the attack." (Id.) Plaintiff complains that friends of his attackers flooded his cell with toilet water for approximately four hours. (Id.) Plaintiff indicates that he was later moved to A-5 because he was on "suicide watch." (Id., p. 6.) Plaintiff complains Defendant Ackers came to his A-5 cell around the second week of September again "trying to force [Plaintiff] to be moved into population, and into a pod where [Plaintiff] would be attacked." (Id.) Plaintiff asserts that when he refused to be moved, Defendant Ackers took him out of the cell, placed him at a table, and handcuffed him at a table "like a dog." (Id.) Plaintiff concludes that the foregoing put his "life, liberty and safety in danger," "put [him] through pain and suffering," "forced cruel and unusual punishment, [and] mental anguish." (Id.)

Concerning Defendant Brent, Plaintiff alleges that Defendant Brent "approached several inmates to try to get [Plaintiff] hurt, or to get [him] attacked by inmates for the gangs." (Id., p. 9.)

---

. . .  And is not otherwise violative of the Constitution." *Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994), *cert. denied*, 513 U.S. 889, 115 S.Ct. 235, 130 L.Ed.2d 158 (1994); *see also Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995)(finding that "a prison inmate does not have a protectable liberty or property interest in his custodial classification and an inmate's disagreement with a classification is insufficient to establish a constitutional violation"); *Posey v. Dewalt*, 86 F. Supp.2d 565, 571 (E.D.Va. 1999), *appeal dismissed by*, 215 F.3d 1320 (4th Cir. 2000), *cert. denied*, 531 U.S. 971, 121 S.Ct. 411, 148 L.Ed. 318 (2000)(stating that "[p]ut simply, petitioner has not stated a due process claim because he has no protected liberty interest in a particular classification within BOP").

In support, Plaintiff states that Officer Castell informed Defendant Brent to "not allow hallway trustees to come into the quarantine Pod of C-1 – C-4." (Id.) Plaintiff alleges that Defendant Brent put his life in danger "on Friday morning" because instead of "feeding C-2," Defendant Brent "went up in the tower to send down Kaci Wagnor" to "feed C-2." (Id.) Plaintiff contends that CO Wagnor did "not know what was going on while CO Brent went in the tower, and left both doors open so the hallway trustees" had access to the area. (Id., pp. 9 – 10.) Plaintiff asserts that the hallway trustees were "some of the exact same people who attacked and sexually assaulted [Plaintiff]." (Id.) Plaintiff contend that Defendant Brent "did this on purpose and sent Wagnor in to tell her to have [Plaintiff] help with trays, when both doors were open, and the inmates were waiting." (Id., p. 10.) As a result, Plaintiff states that on "Sunday, [Plaintiff] was forced to move from C-2 Pod to A-6." (Id.) Plaintiff concludes that Defendant Brent subjected him to "mental stress, pain and suffering mental anguish, [and] stress." (Id.)

Concerning Defendant Carter, Plaintiff alleges that Defendant Carter "brought in handcuffs to [his] roommate" and brought in tobacco products to gang members. (Id., pp. 10 – 11.) Plaintiff further alleges that Defendant Carter would tell other inmates that Plaintiff was a "rat" that "told on the people who attacked [him]." (Id., p. 11.) Plaintiff concludes that Defendant Carter put him "in danger" and subjected him to "mental stress." (Id.)

Concerning Defendant Petticrew, Plaintiff appears to complain that Defendant Petticrew continued "to write [Plaintiff] up" for refusing housing "despite being told by Captain Reed that [Plaintiff's] life was in danger that there is a ("SOS") stab on sight order through WRJ." (Id., pp. 11 – 12.) Plaintiff acknowledges he had a disciplinary hearing in October 2021 concerning one of the "write ups" and that Captain Reed testified that Plaintiff was unsafe "in DCR" because two

14

gangs want Plaintiff killed. (Id., p. 11.) Plaintiff further states that Defendant Petticrew "said he did not have a choice [because] Major Fleming told him to write [Plaintiff] up." (Id.) Plaintiff, however, complains that he "was found guilty of refusing housing even though [he] never refused housing." (Id.) Plaintiff asserts he "was further punished again and wrote up again by Petticrew of this in April 2022." (Id., p. 12.) Plaintiff claims that during his disciplinary hearing, Defendant Petticrew again stated that "Fleming made him, and he did not know why because there were several inmates on A-6 who he did not write up who were in danger." (Id.) Plaintiff states he was found guilty of the violation and punished, which resulted in Plaintiff being unable to "call home . . . to talk to family."[4] (Id.) Plaintiff concludes this resulted in cruel and unusual punishment because he endured "mental suffering, pain, and stress" from the write ups and being increased to a higher security level (Level 3). (Id.)

In their Motion for Summary Judgment, Defendants Aldridge, Fleming, Ackers, Brent, Carter, and Petticrew ("Defendants") state that they "interpret Plaintiff's Amended Complaint to allege a claim for failure to protect Plaintiff from violence by other inmates both prior to the attack and after." (Document Nos. 92 and 93.) Defendants argue that "Plaintiff has failed to produce any evidence to support this claim and this claim also fails as a matter of law because Plaintiff admits there was no warning for the attack and that he was never attacked again." (Document No. 93, p.

---

[4] To the extent Plaintiff alleges that the disciplinary charges were false, such does not state a constitutional claim. It is well-established that the act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights. *See Freeman v. Rideout*, 808 F.2d 949, 951 (2nd Cir. 1986)("The act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights."); *McClary v. Fowlkes*, 2008 WL 3992637, *4 (E.D.Va. 2008)(finding inmate has no constitutional right against being falsely accused of conduct that may result in deprivation of protected liberty interest); *Rhodes v. Sterling*, 475 F.Supp.3d 470 (D.S.C. July 30, 2020)(allegations that false disciplinary charges were brought were insufficient to state a Section 1983 claim); *Jenkins v. Bittinger*, 2016 WL 11410971, * 2 (D.S.C. Oct. 17, 2016)("Plaintiff has no actionable constitutional claim against either [defendant] based on his allegations of their filing 'false' disciplinary charges.").

3.) Specifically, Defendants argue that "Plaintiff clearly stated in his deposition that he never had trouble with the inmates that attacked him prior to the attack, did not know he was in danger, and never told a correctional officer or anyone else that he was in danger because there was no advance warning for this attack." (Id., p. 5.) Defendants contends that Plaintiff admits "that he did not suffer a physical injury after the attack on August 15, 2020." (Id.) Defendants note that Plaintiff "alleges that these Defendants all took some action that made him believe that he might be attacked again or placed him in some perceived danger." (Id., p. 6.) Defendants, however, contend that "Plaintiff has failed to allege that he suffered any physical injury after the August 15, 2020, attack." (Id.) Defendants conclude that Plaintiff's de minimis physical injuries cannot support a claim for mental or emotional injury. (Id., pp. 5 – 6.) Accordingly, Defendants conclude that Plaintiff fails to state a claim as a matter of law for violations of the Eighth Amendment. (Id., pp. 3 – 5.)

In his Answer to Defendants' Motion, Plaintiff argues that Defendants are failing to produce "evidence" and he has a Motion to Compel pending before the Court. (Document No. 95.) Therefore, Plaintiff concludes that Defendants' Motion should be denied. (Id.) In his Objections to Defendants' Motion, Plaintiff continues to complain that Defendants are refusing to produce "evidence." (Document No. 100.) Plaintiff concludes it would be a "fundamental error" to grant Defendants' Motion until all the "evidence" requested in Plaintiff's Motion to Compel has been provided by Defendants.[5] (Id., pp. 2 – 3.) Second, Plaintiff states that Defendants "only bring forth very little evidence . . . of the inmate assault." (Id., p. 2.) Plaintiff, however, asserts "[t]his case is not just about the assault, and this case is not about what inmates done." (Id.) Therefore, Plaintiff requests that Defendants' Motion be denied. (Id.)

---

[5] Plaintiff asserted these exact same arguments in his Motion to Compel. (Document No. 84.) By Order entered on August 9, 2023, the undersigned denied Plaintiff's Motion to Compel. (Document No. 99.)

16

The undersigned views Plaintiff's Complaint and Amended Complaint as setting forth a claim under the Eighth Amendment. As stated above, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety" under the Eighth Amendment. Wolfish, supra, 573 F.2d at 125. Thus, sentenced prisoners are entitled to reasonable protection from harm at the hands of fellow inmates and prison officials under the Eighth Amendment. See Farmer, 511 U.S. at 832-34, 114 S.Ct. at 1976-77; Trop v. Dulles, 356 U.S. 86, 102, 78 S.Ct. 590, 598-99, 2 L.Ed.2d 630 (1958); Woodhous v. Commonwealth of Virginia, 487 F.2d 889, 890 (4th Cir. 1973). Inmates' claims that prison officials disregarded specific known risks to their health or safety are analyzed under the deliberate indifference standard of the Eighth Amendment. See Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987); Moore v. Winebrenner, 927 F.2d 1312, 1316 (4th Cir. 1991), cert. denied, 502 U.S. 828, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991)(Stating that supervisory liability may be imposed where prison supervisors "obdurately," "wantonly," or "with deliberate indifference" fail to address a known pervasive risk of harm to an inmate's health or safety). To establish a failure to protect claim, an inmate must first show "that he was 'incarcerated under conditions posing a substantial risk of serious harm.'" Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015)(quoting Farmer, 511 U.S. at 834, 114 S.Ct. at 1976). Second, the inmate must show that the defendant acted with "deliberate indifference to inmate health or safety." Id. There is a two-prong test to establish deliberate indifference: "the evidence must show that the official in question subjectively recognized a substantial risk of harm," and "subjectively recognized that his actions were 'inappropriate in light of that risk.'" Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)(citation omitted). The plaintiff must show "actual knowledge as to both elements." Id. In particular, Plaintiff must establish that each Defendant "knows of and disregards

an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114 S.Ct. at 1979. The Fourth Circuit has acknowledged that the "actual knowledge standard required to find prison officials deliberately indifferent to a substantial risk of serious injury may be proven by circumstantial evidence." Makdessi v. Fields, 789 F.3d 126, 137-38 (4th Cir. 2015)(stating that "even under the subjective standard, a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious"); also see Porter v. Clarkes, 923 F.3d 348, 361 (4th Cir. 2019)("an obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate"). Thus, a prison official's subjective actual knowledge can be proven through circumstantial evidence, for example, that the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." Farmer, supra, 511 U.S. at 842, 114 S.Ct. at 1984. Additionally, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842, 114 S.Ct. at 1984. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk." Id. Prison guards, however, "have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." Prosser v. Ross, 70 F.3d 1005, 1008 (8th Cir. 1995); see also Winfield v. Bass, 106 F.3d 525, 532 (4th Cir. 1997)(en banc)("[S]uch heroic measures are not constitutionally required."). Id. Courts "have found that 'a corrections officer's

failure to intervene in a beating can be the basis of [§ 1983] liability" if the officer had a reasonable opportunity to act and "simply refused to do so.'" Raynor v. Pugh, 817 F.3d 123 (4th Cir. 2016)(citing Smith v. Mensinger, 293 F.3d 641, 650 (3d. Cir. 2002)); also see Odom v. S.C. Dep't of Corr., 349 F.3d 765, 773 (4th Cir. 2003)("[A] correctional officer who stands by as a passive observer and takes no action whatsoever to intervene during an assault violates the [Eighth Amendment] rights of the victim inmate."); but see Prosser v. Ross, 70 F.3d 1005, 1008-09 (8th Cir. 1995)(finding no deliberate indifference where prison guard ran to get help immediately after inmate threw first punch at plaintiff). Furthermore, it is insufficient for Plaintiff to make collective allegations against all defendants without identify how each individual defendant personally interacted with Plaintiff or was responsible for the deprivation of his Eighth Amendment rights. Langford v. Joyner, 62 F.4th 122, 124-25 (4th Cir. 2023). Plaintiff in this case must therefore allege and establish that *each* Defendant was aware of the excessive risk to Plaintiff's health or safety and *each* Defendant disregarded that risk.

First, the undersigned considers Plaintiff's claim that Defendants violated his Eighth Amendment rights by failing to protect Plaintiff from the attack that occurred on August 15, 2020. As explained above, once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. During his deposition, Plaintiff testified that after his initial 20-day COVID quarantine, Plaintiff was placed in Pod B-8 on August 13, 2020. (Document No. 92-1.) Plaintiff acknowledges that from the time he arrived in Pod B-8 until the date of the attack, Plaintiff had no issues or trouble with inmates in that area. (Id.) Plaintiff testified that prior to the attack, there was no indication that he was going to be attacked or that he was in

any danger from the inmates that attacked him. (Id.) Plaintiff, therefore, acknowledges that he had not notified any correctional officers or prison officials that he believed in was in danger prior to the attack. (Id.) Thus, the undersigned finds there is no evidence that Defendants knew of and disregarded an excessive risk to Plaintiff's health and safety prior to the attack. To the extent Plaintiff alleges that Defendants violated his constitution rights by failing to protect him regarding to the attack on August 15, 2020, the undersigned respectfully recommends that the District Court grant Defendants' Motion.

Second, the undersigned will consider Plaintiff's claim that Defendants violated his Eighth Amendment rights by failing to protect Plaintiff after the attack that occurred on August 15, 2020. Beyond his conclusory allegations, Plaintiff offers no specific factual allegations or evidence that Defendants knowingly disregarded an excessive risk to Plaintiff's safety subsequent to the attack on August 15, 2020. Plaintiff merely indicates that he believes Defendants were attempting to disregard an excessive risk to Plaintiff's safety by threatening to house Plaintiff in areas where Plaintiff believed he would be unsafe or harmed. To prevail on a failure to protect claim, a plaintiff "must do more than allege a generalized concern for his safety and welfare." Drayton v. Cohen, 2012 WL 666839, * 7 (D.S.C. Feb. 29, 2012), aff'd, 474 Fed.Appx. 991 (4th Cir. 2012). Additionally, Plaintiff does not allege that he was ever housed in one of the areas where Plaintiff objected to the housing assignment because Plaintiff believed such a housing assignment would threaten his safety. Plaintiff merely appears to complain that Defendants subjected him to cruel and unusual punishment by threatening to house him in areas Plaintiff believed were unsafe and by telling other inmates Plaintiff was a "rat." The verbal harassment or verbal abuse of an inmate by prison guards, without more, is insufficient to state a constitutional deprivation. Ivey v. Wilson,

832 F.2d 950, 954-55 (6th Cir. 1987); also see Lindsey v. O'Connor, 2009 WL 1316087, at * 1 (3rd

Cir. (Pa.))(holding that "[v]erbal harassment of a prisoner, although distasteful, does not violate

the Eighth Amendment"); Purcell v. Coughlin, 790 F.2d 263, 265 (2nd Cir. 1986)(stating that name-

calling does not rise to the level of a constitutional violation); Collins v. Cundy, 603 F.2d 825, 827

(10th Cir. 1979)(finding that a sheriff's threats to hang a prisoner were insufficient to state a

constitutional deprivation). In the instant case, the undersigned finds the record is void of any

evidence that Defendants knew of and disregarded an excessive risk to Plaintiff's health and safety

after the attack. To the extent Plaintiff alleges that Defendants violated his constitution rights by

failing to protect him after the attack on August 15, 2020, the undersigned respectfully

recommends that the District Court grant Defendants' Motion.

Finally, Plaintiff appears to complain that his receipt of "write ups" for refusing housing

constituted cruel and unusual punishment because he lost telephone and/or visitation privileges. In

Overton v. Bazzetta, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), the United States

Supreme Court held that a prison policy that "uses withdrawal of visitation privileges for a limited

period as a regular means of effecting prison discipline" does not result in cruel and unusual

punishment. Overton v. Bazzetta, 539 U.S. 126, 137-38, 123 S.Ct. 2162, 2170, 156 L.Ed.2d 162

(2003)(finding a two-year deprivation of visitation privileges did not violate the Eighth

Amendment). The Supreme Court explained as follows:

> This is not a dramatic departure from accepted standards for conditions of
> confinement. Nor does the regulation create inhumane prison conditions, deprive
> inmates of basic necessities, or fail to protect their health or safety. Nor does it
> involve the infliction of pain or injury, or deliberate indifference to the risk that it
> might occur. If the withdrawal of all visitation privilege were permanent or for a
> much longer period, or if it were applied in an arbitrary manner to a particular
> inmate, the case would present different consideration.

Id., 539 U.S. at 137, 123 S.Ct. at 2170(citations omitted). Additionally, there is no constitutional or federal statutory right to use a telephone while in prison." United States v. Alkire, 82 F.3d 411 (4th Cir. 1996)(unpublished opinion). In the instant case, Plaintiff alleges that his telephone and/or visitation privileges were restricted for a period of time as a sanction for violating the prison disciplinary rules regarding the refusal of housing. Thus, Plaintiff's visitation and/or telephone privileges were suspended for a limited period of time. The Court finds that the suspension of Plaintiff's visitation and telephone privileges for a limited time as a means of effecting prison discipline, is not a dramatic departure from accepted conditions of confinement. See Thomas v. Drew, 365 Fed.Appx. 485, 488 (4th Cir. 2010)(no Eighth Amendment violation where inmate's telephone privileges were suspended for more than 50 years as a sanction for "misuse of telephone"); Alkebulanyahh v. Ozmint, 2009 WL 2043912, *10 (D.S.C. July 13, 2009), aff'd, 358 Fed.Appx. 431 (4th Cir. 2009)(no Eighth Amendment violation where an inmate's visitation privileges were suspended for more than two-years following eleven major disciplinary convictions); Williams v. Anderson, 2006 WL 709209, * 13 (S.D.W.Va. March 16, 2006)(finding segregated inmate's inability to "exercise, keep personal hygiene items, change clothes or shower, take part in academic and religious programs or telephone family members" did not violate the Eighth Amendment). Although Plaintiff alleges that that lack of telephone and visitation privileges has caused him emotional distress, Plaintiff does not allege that he has suffered a significant injury or experienced an extreme deprivation of a basic human need. Plaintiff's allegations, therefore, do not present a claim of constitutional magnitude for which relief can be granted. Accordingly, the undersigned finds that Plaintiff's claim that the restriction on telephone and/or visitation privileges resulted in cruel and unusual punishment prohibited under the Eighth Amendment of the United

States Constitution is without merit.[6]

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court

confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED**

that the District Court **GRANT** Defendants Aldridge, Fleming, Ackers, Brent, Carter, and

Petticrew's Motion for Summary Judgment (Document No. 92); and **REFER** the matter back to

---

[6] To the extent Plaintiff alleges a liberty interest in retaining his telephone and/or visitation privileges, the undersigned finds that Plaintiff's claim is without merit. The denial of privileges and confinement in segregation are matters clearly contemplated by Plaintiff's original sentence. *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991)(To safely and efficiently run the prison, prison officials maintain broad discretion over an inmate's "location, variations of daily routines, changes in conditions of confinement (including administrative segregation), and the denial of privileges"); *Hatch v. District of Columbia*, 184 F.3d. 846, 855 (D.C. Cir. 1999)(stating that "the transfer of an inmate to less amenable and more restrictive quarter for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence"); and *Gholson v. Murry*, 953 F. Supp. 709, 716 (E.D.Va. 1997)(finding that the denial of work opportunities and certain education programs did not impose an atypical and significant hardship on inmates placed in segregation in relation to the ordinary incidents of prison life). Furthermore, it is well established that an inmate has no absolute right to prison visitation or telephone privileges. *See Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 109, S.Ct. 1904, 104 L.Ed.2d 506 (1989)("The denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence and therefore is not independently protected by the Due Process Clause."); *Smith v. Roper*, 12 Fed.Appx. 393, 396 (7th Cir. 2001), *cert. denied*, 534 U.S. 1093, 122 S.Ct. 839, 151 L.Ed.2d 718 (2002)("In light of *Sandin*, the deprivations that Smith suffered as a result of the disciplinary proceedings - namely, 22 days in segregation, a six-month loss of privileges associated with his demotion to C class, and six days without phone privileges - do not implicate a liberty interest."); *Freitas v. Ault*, 109 F.3d 1335, 1337-38 (8th Cir. 1997)(finding that an involuntary transfer to a higher-security facility and loss of work and phone privileges did not constitute atypical and significant hardship); *Alkebulanyahh v. Ozmint*, 2009 WL 2043912, *9 (D.S.C. July 13, 2009), *aff'd*, 358 Fed.Appx. 431 (4th Cir. 2009)("[P]rison visitation does not implicate the standard set forth in *Sandin*."); *Principio v. McGinnis*, 2007 WL 2344872, * 2 (W.D.N.Y. Aug. 15, 2007)(finding that "60 days of keeplock with loss of telephone, packages, recreation and conjugal visits," was not an atypical or significant hardship); *Richardson v. Johnson*, 2001 WL 360843, * 1 n. 1 (N.D.Tex. April 5, 2001)(finding that phone-privilege restrictions, like commissary and recreation restrictions, do not impose a significant or atypical hardship on the inmate in relation to the ordinary incidents of prison life); *James v. Odom*, 2000 WL 1136563 *5 (S.D.Ala. May 30, 2000)(finding a 45-day restriction on inmate's "store, phone, and visiting privileges" did not constituted an atypical or significant hardship); *Ozolina v. Durant*, 1996 WL 82481, * 1 (E.D.Pa. Feb. 26, 1996)(Under *Sandin*, "there is no right to visitation protected by the Due Process Clause."); and *White v. Keller*, 438 F.Supp. 110, 114 (D.C.Md. 1997), *aff'd*, 588 F.2d 913 (4th Cir. 1978)("[T]here is no constitutional right to prison visitation, either for prisoners or visitors"). Accordingly, to the extent that Plaintiff is claiming his liberty interest in retaining telephone and/or visitation privileges were violated, the undersigned finds that Plaintiff's claim is without merit.

the undersigned for further proceedings regarding the remaining Defendants.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Robert C. Chambers. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Chambers and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: October 18, 2023.

Omar J. Aboulhosn
United States Magistrate Judge